Collins, Adm'r of Carman, vs. Carman's Exc'r.

---

# WILLIAM H. COLLINS, Adm'r of ELIZA CARMAN, *vs.* JACOB CARMAN, EXC'R of WM. CARMAN.

A testator directed a certain " lot, house and furniture to be used by his wife during her life," and that the trustees named in his will should pay to the niece of his wife " $50 per month for the expenses of all the comforts and necessaries that may be necessary for the family of his wife." HELD :

That these provisions of the will in regard to the widow are such devises of realty and bequests of personalty, within the meaning of the act of 1798,

ch. 101, sub-ch. 13, as to create a necessity for their renunciation before the widow can claim her dower or thirds.

A testator made provisions by will for his wife, who was *insane* at its date, and continued so until her own death, more than four years after that of her husband, and never renounced the will, but enjoyed the benefits thereby provided for her during her life.  HELD :

That her administrator upon her death cannot make the renunciation for her, nor by reason of *her insanity* claim her legal share of the estate notwithstanding the provisions of the will,

Whether a court of equity can or cannot make an election or renunciation for an insane widow during her life and in proper time.   *Quere.*

Considerations of evil and hardship may properly exert an influence in giving construction to a statute where its language is ambiguous or doubtful, but not when it is plain and explicit.

By the act of 1798, ch. 101, sub-ch. 13, every valid devise or bequest to the widow is made an effectual bar to her dower or thirds, unless removed by renunciation, and until that is made the bar remains.

The law admits of no excuse for a failure to renounce; if she makes no election within the time prescribed, the law makes it without stopping to inquire for what reason she made none.

The act of 1798 has changed the common law: under it when a man dies leaving a will making *valid* gifts of real and personal estate to his wife, she has not, as she had at common law, a vested right to dower and to her thirds of his personalty, but her vested rights are under the will by virtue of the statute law.

This act gives to the husband the power to extinguish the common law rights of his widow unless she thinks proper to renounce the will, and to effect the husband's object the wife need not declare her *assent*, but if she desires to defeat it she must do so by an express *dissent.*

This dissent by the widow is an act which must precede her becoming entitled to or vested with those rights which she might have claimed but for the will.

This election *vests* in the widow the right of dower and thirds in lieu of what the will had given, and the failure to renounce does not therefore work a *forfeiture* of any *vested rights,* but simply prevents her from acquiring the rights she would have had had her husband died intestate.

The language of the act is comprehensive enough to include *every widow,* whether sane or insane, and the act having made no exception in favor of the latter, the courts can make none, whether they be courts of law or equity.

There is but one rule of construction for statutes, and that must be applied as well in a court of equity as in a court of law.

Where the law directs an act to be done or a condition to be performed for the purpose of conferring a right, that right cannot be acquired if the act is left undone or the condition is not performed.

Collins, Adm'r of Carman, *vs.* Carman's Exc'r.

The right to renounce seems to be a *personal* privilege, and cannot be exercised by the administrator of the widow, especially after the lapse of four years from the death of the husband, and after she had enjoyed during all that time the benefits provided for her by the will.

The law is vigilant in endeavoring to avoid delay as far as practicable in the settlement of estates, and has therefore required the widow's renunciation to be made within six months, and having made no exception in favor of an insane widow in this particular, the court cannot say there is no limitation of time as to her short of her life.

The 5th section of the 13th sub-ch. of the act of 1798, ch. 101, making the widow *accepting* a devise a purchaser with a fair consideration, was not designed to provide for the free exercise of volition on the part of the widow, but the analogy to the case of a purchaser has reference to the *validity* of the devise.

APPEAL from the Equity Side of Baltimore county court. This appeal was taken from an order of the court below, (LE GRAND, A. J.,) dismissing the bill of the appellant. The facts of the case are fully stated in the opinion of this court.

The cause was argued before ECCLESTON, MASON and TUCK, J.

*Thomas S. Alexander* and *William Schley* for the appellant.

1st. The will of the deceased contains no such devise to, or provision for, the widow as required her to make a renunciation in order to entitle her to claim her reasonable part or thirds of the testator's personal estate. The act of 1798, ch. 101, sub-ch. 13, speaks of a devise or bequest "*to the wife;*" she is barred by any "*such*" devise or bequest. Now this testator gives nothing *to his wife*, and does not say that he intends the provisions made for her shall be in lieu of her legal rights. He directs that she shall be taken care of *by others*, and makes provision to enable them to fulfil his wishes. But he gives nothing *to his wife*. He provides even for her funeral expenses out of *his* estate. She had nothing by his will, not even enough to bury her. We do not rely upon any mere technicality in respect of any distinction between a bequest, *per directum*, to the wife herself, and a bequest, *per indirectum*, to another for the use of the wife. There is a direction to

64    v.5

pay *Susan H. Jones* $50 per month for the expenses of the family of the wife, and this is to be disbursed by *Susan H. Jones*, who is to be allowed a commission therefor.   Could the wife, if *compos mentis,* have renounced this bequest to Miss Jones *without her consent and concurrence?*   The *object* of the testator was to have his wife, in her unhappy condition, properly cared for, and to accomplish this he gave to another person, not to his wife, the necessary means.   If any bequest is made directly to the wife the case is plainly within the act. If a bequest is made to A *for the use* of the wife, it is still a bequest to the wife, not *per directum,* but *beneficially* to her; she has an *interest* constituting a right, legal or equitable, as the case may be, and it is within the act, and may be aptly said to be a bequest *to the wife.*   But where any thing is given to A, and A is charged with the performance of something which the testator deems it his duty to provide for, even if that *something* to be done by A relates to the care and comfort of the wife, it cannot be truly said that what is thus given to A is given *to the wife,* and therefore it is not a case within the act.   Such is the case before the court, and it seems to us that this reasoning is natural and just, and more especially in a case where a *forfeiture* of acknowledged legal rights would otherwise result.   The same views are equally to be taken in regard to the bequest of the furniture. The question is, does he give *to his wife* the use of the furniture, or does he give it in such way as to exclude all idea *of property* in her?   It was to be put under the care of the *housekeeper,* and the trustees were so instructed to place it under her care.   The *wife* had ownership of nothing, nor the right as mistress, or as one having authority, to the *use* of any thing.   Every thing in and about the establishment were to be administered entirely independent of her volition.   She was the *object,* not the *donee,* of these provisions of her husband's will.

2nd.  The provisions of the act of 1798, ch. 101, sub-ch. 13, requiring the widow to file her renunciation of the bequests contained in the will of her husband, in her favor, on

pain of being barred of her reasonable part or thirds of her husband's estate, imply choice and election on the part of the widow, and cannot apply to the case of a widow, who was at the time of the. testator's death, and ever after, *non compos mentis.*

What is the true construction and effect of this act? Upon reading over the entire sub-chapter, it will be found there is no distinction made between the widow's acknowledged legal right to dower, and her acknowledged legal right to a share of the personal estate of the husband. It will also be seen that the widow's rights referred to in the act are recognised as rights *already existing*, and are not introduced or created by it. It becomes material then to consider what were the legal rights of a widow in Maryland at the time of the passage of the act of 1798? So far as respects her right to dower in her husband's real estate no question was ever made. It was a right existing at common law, favored by the common law, not dependent upon the will of the husband, not resulting from his bounty nor subject to his control. But in relation to personal estate there have been at different periods differing opinions expressed by eminent jurists, in England and in this country, as to the husband's power to bequeath his personal estate, irrespective of any claim of his wife. But in Maryland there can be no question made that at the time of the passage of the act of 1798, a husband had not the power to give away his personal estate from his wife. In the case of *Griffith vs. Griffith*, 4 *H. & McH.*, 101, the very point was decided, that "at *common law* the wife was entitled to a third part of the personal estate independent of the husband." See also 4 *H. & J.*, 480, *Coomes vs. Clements.* The first of these cases was argued with eminent ability by the ablest counsel of that day, and in the report of the case will be found the written opinions of *William Pinkney* and *William Cooke*, both in favor of the wife's legal right. We think therefore that it is perfectly clear that the widow's right in relation both to real and personal estate at the time of the passage of the act of 1798, was a known and acknowledged

*legal right,* not introduced for the first time into the law of Maryland, but an ancient, venerable, and sacred common law right.

Our next proposition is, that this *legal right* was left by that act precisely as it was before its passage. Let us examine each section separately.

The 1st section of the 13th sub-chapter introduces a new rule of construction of a will where any thing is devised or bequeathed to a widow, and it is declared that it "shall be construed *to be intended* in bar," &c., "unless it be otherwise expressed in the will." By the previous acts of 1715, ch. 39, and 1729, ch. 24, the case of an election by a widow is made to depend on the question of the testator's intention, for she was to elect, "when *it appears* not" in the will that he "*intended*" the devise as a legacy only. As difficulties might, and no doubt did arise, as to whether his intention in given cases did or did not *appear*, the section in question excluded such difficulties, by making an election in every case where it was not otherwise *expressed.*

The 2nd section re-enacts the provisions of the act of 1729, ch. 24, secs. 10 and 11, in somewhat different language. By the latter the widow was barred in case she shall "*neglect*" to make her election in time. The former says, she is barred "*unless* she renounces" the will within the limited time. In the form of the renunciation the words are: "and I *elect* to take in lieu thereof my dower or legal share of the estate of my husband."

The 3rd section applies to a devise of both real and personal estate, and requires a renunciation of both.

The 4th section applies to the case of a devise of real estate only, or of personal estate only, and provides that in case of a devise of real and none of personal estate, if she abide by the will, she loses "her *legal right* in the real, but retains her *legal right* in the personal."

The 5th section shows that a widow "accepting or abiding by a devise in lieu of her legal right shall be considered *a purchaser with a fair consideration.*" The act of 1729 did

not contain this just and equitable provision. The widow is in truth a purchaser, and she can only be a purchaser on the ground that in accepting the devise she *parts with* an existing legal right. We think then that this analysis of the act shows that it left the widow's legal rights precisely the same that they were at the moment of its passage.

If we are right in this, Mrs. Carman, by her marriage, acquired a potential right of dower in her husband's real estate, and a potential legal right to receive one-third of the clear personal estate he might leave at his death. Of these legal rights, thus secured to her by the law of the land, he could not deprive her without her *consent*, express or implied, in case she should survive him. But he made certain provisions for her by his will, and this raised a case of *election*. She could not claim both. The act of 1798 gave her time to make an election between the provisions made for her by the law and those made for her by the will. If she elected to hold the former, she was required to file a formal renunciation as *evidence* of her choice. If to hold the latter, no renunciation was required; the omission to renounce was evidence of her acceptance of the devise. Silence was evidence of consent, "*qui tacet consentire videtur.*" But in this case the widow was in a condition of *insanity*. She had no capacity to *purchase*, no mind to make an *election*, and no one to act for her. Can it be law that under such circumstances her *omission* to file a renunciation shall have the effect to bar her of her legal rights? If so then an insane wife is perfectly at the mercy of her husband, however merciless he may be, for if the wife in this case is barred of her legal rights, the result would have been the same, in case her husband had been worth a million and had given her a legacy of a hundred dollars. If she is concluded by the omission to renounce, then there is one law for a *sane* wife and another law for an *insane* wife, for the former may protect herself in her legal rights by making due renunciation, whereas, the latter from her inability to act at all, is deprived of her legal rights. But there is but *one law* for the wife, sane or insane, and if the transac-

tion is, in one case, in the nature of a *purchase*, grounded on *consent, choice, election, acceptance*, in other words, *on contract*, so in the other, as there is no capacity there can be no contract, and she cannot be said to *sell her legal* rights. Of all persons whom the law guards with the greatest care and tenderness and zeal, the unhappy lunatic may be considered the first. It is not mere christian feeling, it is not the consequence of improved civilization, but it is found in our law from the earliest periods, as ancient as law itself, that a lunatic can do no prejudice to his person or estate, he can commit no *crime*, incur no *forfeiture*, make no contract. Limitations do not run against him. And even if our act had said *per directum*, that a widow should *forfeit* her legal rights if she did not renounce, the *law* would have grafted an exception in favor of a lunatic widow, and would have held the act to be *lex sub graviori lege*. It would not have been presumed that the legislature intended to abrogate all the cherished and sacred principles of the law in relation to lunatics, much less in the actual provisions of the act, which clearly provides for an opportunity for election, which of course implies *capacity* to elect.

In the case of *Earl Digby vs. Howard*, 4 *Sim.*, 588, and the same case on appeal to the House of Lords, 2 *Clark & Finnelly*, 636, the great principle was expressly decided by the vice-chancellor, and not only *not* overruled, but not even questioned by the House of Lords, that in case of a *lunatic* there can be no presumption of acquiescence. See also 1 *Merivale*, 296, *Ashby vs. Palmer.* 1 *Peere. Wms.*, 389, *Seeley vs. Jago.* 4 *Hill*, 73, *Breasted vs. Farmers Loan Co. Shelford on Lunacy*, 242, in 2 *Law Lib.*, 154, 157. In *Demarest vs. Wynkoop*, it was decided, that the general enabling words of a statute do not extend to infants and *femes covert*, and persons laboring under disabilities, but there is no case where a *forfeiture* has been enforced against a lunatic because of default. The same general language is used in the acts of 1795, ch. 88, sec. 1, 1799, ch. 79, sec. 1, and 1820, ch. 161, secs. 1, 2, in reference to non-resident defendants in chancery

suits, and no exceptions are made in favor of parties under disabilities, yet these acts have never been construed to extend to *lunatics* or *feme coveris*. There is a great distinction between statutes of limitations, and for repose, which bar *remedies*, and those which bar a party of *his rights*. The cases that may be cited from Kentucky and North Carolina, are not applicable, because in those States the widow had no *legal right* to the personal estate previous to the statute, and the latter expressly gave it to her.

The argument on the other side is, that where any bequest is made to the widow, renunciation is a *condition precedent* to the creation of her legal rights; that by renunciation she *acquires* a legal right. If this be the true construction of the act of 1798, if the law speaks the language, that where *anything* is given the widow has no legal rights whatever, *unless* and *until* she shall actually file a renunciation, and that the law *then, for the first* time, and on the basis of such renunciation as a *condition precedent,* clothes her with legal rights, then we are, of course, excluded from our present claim. The act is then a tyrant which regards nothing but its own will. But we have endeavored to show that such is not its true construction; that it recognises the existence of the legal rights of the widow; that where anything is given by the will a case of *election* arises, and that until election be made both rights subsist *in posse,* the one or the other to become a right *in esse* when election is made, and that the act makes the omission to renounce *evidence* of her election to accept the devise offered in lieu of her legal right.

But it is said that this right to renounce is personal to the wife and cannot be claimed by her personal representatives. If the wife were *capable,* we have no doubt that her representatives, after the lapse of six months, could not, even if she had died within that time, exercise this right. But in case of a lunatic time would not begin to run, and her actual incompetency would prevent the forfeiture of her *legal rights.* In the case of *Boone vs. Boone,* 3 *H. & McH.*, 95, the widow was *compos mentis* at the time of the death of the husband, and there was, therefore, a time within which she might have elected. Here the widow was insane at the time of the death

of the husband, and continued so until her own death.   But suppose an insane' widow makes her election and afterwards recovers her reason, could she not avoid her election?   Such an election would clearly not be binding upon her.   See 7 *Iredell*, 72, *Lewis vs. Lewis.*   6 *Do.*, 276, *Hinton vs. Hinton.*

If a renunciation in fact was necessary, it was made by the complainant on the very day of his appointment, and until his appointment there was no person *in esse,* (as the wife had no committee or trustee,) competent to act.   If it be said the orphans court was not *the forum*, then, by his bill, as in the case of the *Duchess of Norfolk*, the administrator has come into chancery, which undoubtedly has jurisdiction.

*T. P. Scott* and *John V. L. McMahon* for the appellee.

The bill every where assumes or concedes, that the devises or bequests under consideration were such as would, under ordinary circumstances, have rendered a *renunciation* of them necessary, and claims for the complainant the right to renounce because of the continued insanity of Mrs. Carman until her death.   But the argument goes beyond this, and maintains that this was not a case in which any renunciation was necessary, or at least not as to the *personal estate*, and this it will be proper first to consider.

The provisions as to such renunciation, (contained in the 13th sub-ch. of the act of 1798, ch. 101,) are familiar to the court.   Suffice it to say that they enact, that every devise of any estate in lands shall be *construed to be intended to be in bar of her dower, and every bequest of personal estate to be in bar of her distributive share*, so that if such devise or bequest is made, the law presumes it to have been intended as in bar of her dower or distributive share, and therefore renders renunciation necessary in such a case.   And the argument, (whilst it seems to concede that any devise or bequest either directly to the wife, or indirectly to her by devise or bequest to another for her use, would be sufficient to require renunciation,) maintains, that the provision for the monthly allowance of $50, to be paid to and expended by the niece, Miss Jones, for the benefit of the wife, was not of such a character.   In directing

Collins, Adm'r of Carman, *vs.* Carman's Exc'r.

attention to this part of the bequest, the argument has over-looked another part which is free from all doubt, as we conceive, as to this question. There is by the will not only an express devise of the use for her life of the house and lot, but also *of the furniture in the house,* so that there is an express bequest for life, or of the use for life (which is the same thing) of all the furniture in the house. And it will not be denied, that a bequest for life gives a mere usufructuary interest, and that the bequest of the use for life gives a life estate, and would carry with it all the right to increase, &c.; and that where the use consists in the consumption, there it gives the absolute interest. Authorities are not wanted for such a proposition.

It is not, therefore, necessary to enquire, whether the $50 per month allowance is not also a bequest of personalty within the meaning of the act. Any bequest of personal property is sufficient to put the party to the renunciation, without regard to the amount or nature of the bequest. But if it were necessary to enter into this enquiry, it would not, we think, be difficult to show that the monthly bequest of $50 would alone be sufficient for that purpose. The argument on the other side concedes, that a *direct* bequest to the widow is not absolutely necessary for that purpose, and that a bequest to another *for the use* of the widow might be sufficient, and distinguishes this case, because although here the widow was certainly the object of the bequest, still the funds and the expenditure of them was confided to another. Yet what is it but the creation of a trust for her benefit, under which the trustee is to receive the funds and regulate the expenditures? The expenditure being directed to be made for the support of the widow, is not the widow a legatee as *cestui que trust,* who could, by herself or next friend, require an account of this trust and compel its faithful fulfilment? Exactly such a trust as exists in many cases? Even a general direction to the executor to support a party, (without specifying the sum to be thus expended,) makes such a party a legatee, who may enforce the bequest by bill in chancery, (*Farwell vs. Jacobs,* 4 *Mass. Rep.,* 635.) And where the sum and the object are both defined, it will be

65    v.5

difficult, we think, to maintain, that such a bequest is not one for the use and benefit of the wife. This will be easily tested by enquiring, what would be the effect of the wife's coming in and expressly renouncing that bequest if competent to do so? Would it not put an end to the bequest or the payments under it? and could the trustee, after such renunciation, assert any claim to it?

We therefore consider it clear, that there was such a bequest of personalty (as well as of realty,) as rendered renunciation necessary: and it remains to enquire whether, this renunciation not having been made, and the widow having received the full benefit of the bequest during all her life, the administrator can now renounce, or this court can permit him to renounce, and thereby claim and obtain her full distributive share.

In considering this question as to the validity of the administrator's renunciation, or the power of this court to grant him the right of renouncing, we may well enquire: what it is which the administrator seeks to renounce? And the answer is, a bequest which was fully and completely executed or paid during the life of Mrs. Carman. At her death this bequest became inoperative, she having received the full benefit of it during all her life, and there was therefore in fact, nothing to renounce at her death, the bequest being completely executed, and there being nothing further due or payable under it. There was at the death therefore, nothing on which the statutory power to renounce the bequest could operate, and nothing to which this power was applicable.

But even waiving this, let us see what there is in the act of 1798, ch. 101, sub. 13, which would justify such a renunciation by the administrator, after the death of the widow, and long after the lapse of the time for renunciation, as prescribed by that act and its supplements. And in considering this question, it will be proper to observe, that this right of renunciation is to be governed exclusively by the act of 1798, ch. 101; and that the anterior acts on that subject can only serve to furnish aid in the construction of the former. It will not be questioned that, although the marriage in this case took place in 1791,

still the rights of the widow, as to the property', and especially the personal property which Mr. Carman left at his death, are to be determined by the act of 1798, and as this bill is confined to the claim for the distributive share of the personal estate, we need not extend our remarks beyond the case. We do not dispute the proposition, that by the law of Maryland, as settled in the cases referred to in the argument for the appellant, the widow is so entitled to her reasonable part or thirds of her husband's personal estate, and that he cannot defeat it *by his will*. Yet it will not surely be contended, that this gave her any vested interest in his personal property during his life, or any thing more than her share of what he may have at his death. During his life he may alien or dispose of it at pleasure. If then the personal property of which he died possessed, was even held by him at the period of the passage of the act of 1798, and had been ever since held by him, there was nothing to prevent the legislature at that period, from passing any law it might deem proper to regulate her right of succession to it, or sharing in it after his death; and as to personal property acquired after the act, (which was the predicament of all he held at death,) there could not be a possible doubt. The right of Mrs. Carman to her reasonable thirds, as against *the will of her husband,* was then a right given by *the law,* and which the *legislature,* by the act of 1798, could either have wholly taken away, or could modify and regulate at pleasure. The act of 1798, might have enacted, that such a devise or bequest should be a *flat bar* to this peculiar right of the widow, under our law, to claim her distributive share against his will, and it remains only to see to what extent it has made the devise or bequest *a bar,* and how the *bar* is to be removed, or the right saved.

We maintain, in opposition to the views of the counsel on the other side, that by *force of the act of* 1798 itself, the bequest is a bar to the claim, until removed or defeated by the renunciation; that the claim to the share does not arise, until the bequest is repudiated by the renunciation; that the act and its supplements having enacted, that the bequest shall be a bar, until it is renounced, and unless it is renounced within a *given*

516                    MARYLAND REPORTS.

Collins, Adm'r Carman vs. Carman's Exe'r

*time* and by *the widow*, that no other or different renunciation than that authorized by the law will suffice to remove the bar; that the power to renounce is not only to be exercised within a limited time, but is also given *personally* to the *widow*, and to her alone, and that if she neglects or is even incapable of exerting it, the power under the act falls, and that to enlarge that power of renunciation beyond that given by the statute, so as to meet cases of incapacity to exercise it at all, or incapacity to exercise it within the given time, which the statute had not anticipated or provided for, would be to *legislate*, and not to construe and apply the act of 1798.

A very few remarks will suffice to place before the court our views, as to the true construction of these sections of the act of 1798.

The *first* object of the 13th sub-chapter was to put an end to the controversy continually arising, as to the intent of the husband in making devises and bequests to his wife: and as to whether he designed it to be in bar of her dower or distributive share, or intended to give her both. And this source of controversy is effectually removed by the express provisions, that it shall by law be assumed to have been intended as a bar by the husband.

Then follow the provisions as to the effect of such a devise or bequest, which expressly declare, "that the widow shall be barred of her dower by such devise or bequest, unless within ninety days (now six months) after probat, &c., she makes a written renunciation of the form of that given, or to that effect." So that by the express words the *bequest is a flat bar* to the share, *unless it* is removed by the renunciation made as there prescribed; and it is not a provision that it shall be a bar *if she accepts it;* but it is a bar by force of the statute, unless she renounces it, and the bequest being intended to bar her claim to the share, her power is to *defeat the effect of that bequest as a bar, by expressly rejecting the bequest* in the time and manner limited. It is therefore a *bar*, and a *bar by force of the statute* alone, subject only to her power to defeat it as there prescribed; and therefore necessarily remaining a bar, unless thus defeated, and this saving or exception of the widow's

power to defeat it cannot be extended beyond the statute.    A
single illustration borrowed from the decided cases, as to the
statute of limitations will suffice.    These statutes in general
terms, bar rights of entry and action, if not prosecuted within a
given time, allowed by them for that purpose, and it is settled
with regard to these statutes, that if the statutes themselves had
not made an exception in favor of infants and lunatics, the statu-
tory bar would act on them as on all others; and that where an
exception or saving is made on behalf of infants, lunatics, &c.,
the courts cannot add to or enlarge that exception.    Hence in
*Demarest vs. Wynkoop, 3 Johns. Ch. Rep.* 138 and 142,
Chancellor Kent decides, that where a statute makes no saving
or exception, the court cannot add one, and that where the
parties would avail themselves of a saving or exception, they
must take it as the legislature has given it, and under such
restrictions as it has imposed and not otherwise.    And in the
same case, speaking of a supposed equity for extending the
time, he remarks: "The doctrine of any inherent equity, creating
an exception, as to any disability where the statute of limita-
tion creates none, has been long, and I believe uniformly ex-
ploded.    General words in a statute must receive a general
construction, and if there be no express exception the court can
create none.    It was agreed without contradiction in *Stowel vs.
Zouch, (Plowden,* 369, *b.* 371, *b.)* that the general provision in
the statute of fines would have bared infants *femes coverts,*
and the others named in the proviso, (i. e., lunatics,) equally
with persons under no disability, if they had not been named
in the exception or saving clause," and at page 143, he refers
to several cases, expressly deciding "that though the courts of
justice were shut by civil war, *so that no original could be
sued out,* still the statute ran."

Now with reference to this case; here is a bar to her claim to
the share, which would be a flat bar, but for the saving of her
power to renounce the bequest, and whether you call it an act
of renunciation or election, it still gives her but an election to
*renounce,* and makes the bar effectual against everything but
her *renunciation.*    *It does not require her act or assent to
make the bar effectual, the statute provides that*—the act she

is to do is to defeat the bar.    Here then is a case in which it is admitted, that she never did renounce at all, and in which her representative asks the court to permit him to renounce long after the lapse of time limited by the law.    It is admitted, therefore, that no such power to renounce, as is now sought to be exercised, is given by the act, and it is claimed, not because the act gives it, but because the power to defeat, which the act did save to the widow, could not be exercised by her because of her insane condition.    What is it then but to ask the court to enlarge the saving of the widow's rights beyond the savings of the statute to meet a case not foreseen or provided for by the statute?    And if incapacity to exert the power in the manner or time directed, is to be held to give the court the power to enlarge it beyond the statute, what is it but to legislate to meet omitted cases?    Under the act of 1798, the time for renouncing was ninety days: and in the imperfect mode of communication at that period, and the delays in travel, cases might readily occur, and most probably did occur, in which the widow, if absent in a foreign country, *was in fact incapable of making the renunciation within the time,* (as much incapable from those causes as a lunatic,) and yet was it ever supposed that such incapacity would entitle her to renounce afterwards? So long continued illness might produce substantially the same incapacity.    And we do not suppose that any failure to exert the statutory power from causes beyond the control of the party, would entitle the court to add to or enlarge that power, even in cases where it is clearly shown to the court that the party, but for those causes, would have exerted the power.

To these general views many illustrations might be added, founded upon the well settled rules of law, as the effect of conditions, &c., upon estates held by infants and lunatics, and others laboring under disabilities, and which hold that where the performance of a condition is necessary to *save an estate* or to *vest an estate,* those under disabilities must perform or observe the condition according to its terms, just as those under no disabilities.    See 2 *Dana,* 343, *Shaw vs. Shaw.*    7 *Iredell,* 72, *Lewis vs. Lewis.*    2 *Dev. Eq. Rep.,* 344, *Craven vs. Craven.*    7 *How. Miss. Rep.,* 665, *Ex-parte Moore.*

2 *Harrison,* 462.   2 *Kent's Com.,* 452, 4 *Do.,* 35.   1 *Jarman on Wills,* 799, *(note.)*  62 *Eng. C. L. Rep.* 566, *Humfrey vs. Gery.*   But the present is a case, in which the court are called upon, not only to enlarge the time of renunciation to a period of nearly or quite four years beyond the time limited, but also to give it not to the widow, but to her personal representatives.   The act of 1798, expressly gives the power of renunciation only to the widow, and it would, it seems to us, be difficult to maintain, that such an act, looking to and speaking of this act of renunciation as a personal act of hers, could be construed to give it to her representative if not exerted by her from incapacity, even upon general principles, as to the nature of such *personal* powers.   But there exist in the nature and objects of these provisions for the wife out of the husband's estate, obvious reasons for the *statutory* grant of the power to the wife alone. The wife's dower and distributive share, after the death of the husband, are provided by the law, only as means of securing her a comfortable maintenance after his death, and the right to renounce is given to the widow personally for the same end, and the act never contemplated that after her decease, and the object and end of these provisions, insuring her a comfortable support had gone by, the power to renounce should be exercised and the husband's will defeated, only for the purpose of taking away the share from the husband's estate, and giving it to the relatives of the wife.   The power expressly given does not reach such a case; and we think it can scarcely be doubted, that the legislature, even if their attention had been directed to it, would not have extended it to such a case.   At all events there is nothing in the act to warrant such an *extension* by judicial construction of the act of 1798.   And that the privilege of renouncing belongs *to the widow alone* is the precise point, decided in the case of *Boone vs. Boone,* 3 *H. & McH.,* 95.   There the widow died within forty days after her husband's death, without having made any election whether she would abide by the bequest or not, and the question was, *whether the widow's personal representative could renounce and claim her share* of *the personalty.*   "And (to use the language of the report,) Jennings, chief judge of the orphans court, was of

opinion *that the representatives had no right to the privilege which the law allows the widow, being intended entirely for her benefit and personal privilege,''* and on appeal to the *General Court,* that opinion was affirmed. We have thus a decision on this precise point, entitled to the highest considera- tion, and one too still more forcible in its application, because it was a decision before the act of 1798, and upon the provi- sions as to the wife's right of election under the act of 1729, chap. 24, sec. 10.

The argument for the appellee concedes, that if the widow were *capable,* and died within the six months, the administrator, &c., could not make the renunciation, but even that conces- sion, if made to distinguish this case from that in 3 *H. & McH.,* will not avail; the point of the decision is that it is a *power* and privilege, *personal and confined* to the widow, *intended only for her benefit,* and therefore not to be exercised upon her death, even if she died before the time had gone by. See also, 7 *Iredell,* 72, *Lewis vs. Lewis.* 1 *Thoma's Coke, Litt.,* 452, 567, 569. 3 *Bac. Abr., (Bouvier's Ed.,)* 310. 3 *Comyns Digest title Election, B,* 536, 540. 4 *Kent,* 70. 1 *Md. Ch. Decisions,* 147, *Kiddall vs. Trimble.*

And we may add, that not only is this personal *power* of the widow attempted to be executed in this case after death, but also by renouncing a bequest, under which the adminis- trator takes nothing and is entitled to nothing. So that it is not only to extend the power to one to whom it is not given, but also to one to whom the bequest gives nothing, and who therefore renounces a bequest, under which he has nothing to renounce. The power to renounce should at least be limited to those entitled under the bequest.

Nor is there any thing in the facts of this particular case, which could cause regret, that the power is not by the statute extended to such a case. The provisions for the support and comfort of the wife, were exactly such as the most tender and careful husband would have made, far better for that end than any naked bequest, and were most faithfully observed during her life. And the husband not content with this, has by his will distributed among his wife's relatives a large part of his

estate, and more, as is shown by the answer than her share of his estate would have amounted to.

We have not deemed it necessary (under our views of the case,) to consider particularly the case of *Earl Digby Howard*, 6 *Cond. Eng. Ch. Rep.*, 267, and 2 *Clark & Finnelly*, 636, which is so much relied upon in the opposing argument. The point in that case, was whether pin-money, was or not the separate estate of the wife, and if such separate estate, whether the husband's receiving and using the separate property, whilst his wife was a lunatic, could be deemed an user of it with her consent, so as to bar the claim for it by her committee against her husband's estate. Assuming all that is claimed for the case, it does but hold that the separate property could only be given to the husband by contract, or such acquiescence as is evidence of a contract, and that the *non-objection* of a lunatic does not evidence such a contract; and the answer to it is, that in this case, we do not bar the claim to the share by force of any contract express or presumed with the widow. We claim the benefit of the statute bar by force of the bequest unrenounced, the wife's right exists only under and by force of the power to renounce, that power to renounce the statute gives to her as the means of *vesting in her a right to* the share, and *renunciation being admitted* to be essential to give a claim to the share, is only authorized, and can only be made in the manner prescribed in the statute. And whatever might be the effect of acquiescence against the widow, if the power be personal and confined to the widow, and ceases with her death, the power to remove the bar by *renunciation* is gone, and the bar therefore remains in full force.

Upon the whole then we insist:

1st. That under our acts of assembly, relative to the effect of devises to the widow, the devises in this case to Mrs. Carman, were, *by force of those acts alone,* and independently of any consent, a bar to her claim for dower and share of the personal estate, unless, and until the devises were wholly renounced, and renounced in the time and manner directed by those acts; and that no renunciation, other than that authorized by those acts, can remove such bar, nor can the courts alter the time or

mode of renunciation, because of disabilities not provided for by those acts.

2d. That the right given to the widow to renounce the devises, so as to entitle her to her dower and shares of the personalty, by force of such renunciation, could not be claimed and exercised by the appellant, as her administrator, *after her death and after the lapse of the time allowed by law for such renunciation;* because such right is given by law, to the widow alone as a mere *personal right,* and also as one intended only to ensure her a comfortable maintenance and support during her life; and also, because under the acts relative to such renunciation, the administrator is incapable of making the renunciation as required by those acts, the devises and bequests to the widow having been fully enjoyed and exhausted during her life, and the renunciation required being of the whole devises both of *real* and *personal;* and also, because to allow such a renunciation as removing the bar of the acts, would give a new right, not only not given by those acts, but in fact repugnant to their provisions.

ECCLESTON, J., delivered the opinion of this court.

Eliza Carman, who was the wife of Wm. Carman, became insane some time prior to the date of her husband's will, and so continued until her decease, which occurred more than four years after his death and the grant of letters testamentary on his estate.

The will named the appellee with two others as executors and trustees. The others having renounced, the appellee took upon himself the trusts reposed in him.

The clauses in the will which are deemed important in the present controversy are the following:

"Out of the income of my estate and during the lifetime of my wife, Eliza, my trustees above named will pay all taxes and repairs of my lot and house in High street, in the city of Baltimore, in which I order and direct my trustees to take no account of the furniture, so as to have it removed or disposed of; the said lot, house and furniture to be used by my wife Eliza, free from any cost or charge to her during her life.

Collins, Adm'r of Carman, *vs.* Carman's Exe'r.

My trustees will take an inventory of my books and furniture, and give in special charge to the housekeeper, that they be not wasted or destroyed by neglect or imposition on the liberality of my wife. My trustees will employ a housekeeper, who will be kind and careful of my wife Eliza, and I would give the preference to Ann Bell or Elizabeth Miller, with the wages and necessary maintenance for the comfort of my wife Eliza."

"My trustees will pay to the niece of my wife, to wit, Susan H. Jones, fifty dollars per month, and monthly, for the expenses of all the comforts and necessaries that may be necessary for the family of my wife. My trustees will examine the accounts of Susan H. Jones, and for all moneys she may produce satisfactory vouchers for, they shall allow and pay her four per cent. out of other moneys than the fifty dollars per month above mentioned. Any expense of doctors or funeral charges for my wife, is not included in the fifty dollars per month above named."

No renunciation, by the widow, or by any one in her behalf, was made, or attempted to be made, during her life; but the provisions in the will for her benefit were fully complied with by the appellee. Shortly after her decease letters of administration on her estate were granted to the appellant, and very promptly he filed in the orphans court a paper purporting to be a renunciation of the devises and bequests made for the benefit of his intestate. The right to make such a renunciation was denied and opposed in that court by the appellee.

Subsequent to this proceeding the present bill was filed, for the purpose of obtaining a decree declaring the renunciation of the appellant effectual and sufficient; or if, from any cause, it should be deemed informal or imperfect, the complainant prays that he may be considered as revoking, by his bill, the renunciation. He then prays for an account of the personal estate of William Carman, and that his executor, (the appellee,) may be required to pay to the complainant such sum as he may be entitled to receive, in right of his intestate, from the personal estate of her deceased husband.

The renunciation professes to renounce "all the bequests

and provisions made to or for the benefit" of the widow, and claims in lieu thereof her share of the personal estate, and an account of the rents and profits of the realty.

The bill admits that the appellee faithfully fulfilled all the directions of the will, in relation to the support and care of the widow, and that in his accounts he had received credits for such disbursements. And the complainant states, that in case his renunciation shall be available in law, he is willing to make all just allowances in regard to the expenditures which have been made for the widow, upon an account to be properly stated; in which account he supposes the proportions of rents and income from real estate, accruing in right of the widow, so far as received by the defendant, will also be brought into view.

These facts are deemed sufficient to present the questions necessary to be decided. The first of which is, whether the provisions of the will, in regard to the widow, are such devises of realty and bequests of personalty, within the meaning of the act of Assembly, as created any necessity for a renunciation, assuming that where a widow is rendered incapable of renouncing, on account of insanity, her right of dower and share of personalty will be as effectually barred by the statute, as will similar rights of a sane widow, who fails to renounce in time.

Inasmuch as the act of 1798, ch. 101, sub-ch. 13, speaks of a devise or bequest "to the wife," it is insisted that the meaning and design of this language has not been complied with by the provisions made for the benefit of Mrs. Carman; nothing, in reality, having been given *to her*, but the gifts are *to others*, for the purpose of taking care of her.

Notwithstanding this is the argument now urged by the appellant, it is evident that the bill concedes, or is based upon the assumption, that a renunciation would have been necessary if the widow had been of sound mind. And the written argument of the solicitors for the complainant in the court below, which is also before us, is a very faint denial, if a denial at all, of the necessity for a renunciation in regard to

the realty. On this subject they say: "But our position is, that even if, in respect of the real estate, it can be said that there is a devise to her of the house for life, yet, that in respect of the personal estate, there is no bequest *to the wife*."

But independently of any actual or supposed concession, either in the bill or the argument, in our opinion, the provisions of the will, in relation to both species of property, were such as made it necessary for a renunciation under ordinary circumstances.

In *Farwell vs. Jacobs Adm'r*, 4 *Mass.*, 634, the will directed the executor to support, "in sickness and in health," the testator's aged father. The executor having failed to execute the trust, letters of administration *de bonis non cum testamento annexo* were granted to the defendant. He also neglected to support the father, who instituted the suit to recover in damages a sum equivalent to the support and maintenance directed by the will. Upon a statement of facts the court held, that the plaintiff was entitled to a judgment against the estate in the hands of the administrator. Such a bequest, it was said, could be enforced by a bill in chancery, and damages are given at law, in consequence of there being no chancery court in that State. On page 636, C. J. Parsons says: "The direction to support and maintain the plaintiff results from the bounty of the testator declared in his will, and must be considered, as to the remedy, as a legacy." And therefore the case was considered to be within the provisions of their State law, which enacts, in general terms, "that any person having a legacy given him may sue for and recover the same at common law;" page 635.

By the will in *Tolson, et al., vs. Tolson, et al.*, 10 G. & J., 159, the testator gave the residue of his estate to his seven sons, and their heirs and assigns; and then added: "I request my seven sons, above named, to take care of their brother, John Tolson, and his family." John and his family were in abject poverty, but received no support or relief from his brothers. The provision in reference to the family was held void for uncertainty, but the seven sons were considered as

trustees for John, and responsible, in equity, for the payment of such sum as would be proper to compensate for his maintenance since his father's death, and to secure the future payment of an annuity.

If those two cases are to be regarded as recognizing correct principles, we do not perceive how it can be successfully contended that this will gives nothing "to the wife" of the testator. The lot, house and furniture are to be *used by* her free from cost or charge to her during her life. The sum of $50 per month is to be paid by the trustees to Susan H. Jones, for the express purpose of furnishing "the comforts and necessaries" required "*for the family*" of the wife. In addition to this monthly sum, her doctor's bills are to be paid out of the husband's estate, and upon all moneys disbursed by S. H. Jones for family expenses, she is to receive from the trustees four per cent. Under these provisions who was the object of the testator's bounty, S. H. Jones or the wife? Most undoubtedly the latter. If so, had she become sane before six months subsequent to the testator's decease, and had renounced "all claim to any bequest or devise made" to her by the will of her husband, and elected to take in lieu thereof her dower or legal share of his estate, we suppose it could not be said that, nevertheless, S. H. Jones, or any one else, could then have claimed any thing further under the clauses of the will which have been referred to. If we are right in this supposition, these provisions, in legal contemplation, must be gifts to the wife, within the meaning of the act of 1798.

But admitting it possible to entertain a doubt in relation to the $50 per month being a gift to the wife, how can there be any in regard to the house and furniture? The will declares they are "to be *used* by my wife Eliza free from any cost or charge to her during her life." Thus she is entitled to the use of both for life. It is said, however, that the trustees are to take an inventory of the furniture and to give it in special charge to the housekeeper, and this is relied upon as manifesting an intention not to give it to the wife; but if it is to

be in charge of the housekeeper, she is so to have it in charge for the *use* of the wife. It is only a cautious provision made in consequence of her insane condition, so as more effectually to preserve the property for her use. The house and furniture are for her use during life, and the testator speaks of the family as "*the family*" of his wife.

The remaining question, which has been argued with great ability, is an interesting one, and not clear of difficulty. It presents the inquiry, whether an administrator of a deceased insane widow can renounce the will of her husband, and claim such share of his estate as she would have been entitled to had she been sane and made a renunciation in due time; or as if there had been no will, notwithstanding she lived four years and upwards after her husband's decease, and during that period received, regularly, the benefits or gifts provided for her in the will. And supposing the administrator has no authority to make such a renunciation, can he, nevertheless, by virtue of the widow's insanity, claim her legal share of the estate, notwithstanding the provisions of the will for her benefit? Can he do so because the statute does not create any bar to an insane widow's right to dower, or claim to her legal share of personalty, even although the will of her husband gives her both real and personal property?

After a careful consideration of the subject, we think he cannot make the renunciation, or claim any thing beyond what is given by the will. In saying this, we wish to be understood as not intimating any opinion upon the question, whether a court of equity can or cannot make an election or renunciation for an insane widow, during her life and in proper time. This case does not call for a decision on that point.

The argument in behalf of the appellant insists, that at common law, a widow had an acknowledged legal right of dower; and also, a legal right to a share of the personal estate, subject only to the payment of the just debts and claims against her husband. Neither of which rights could she be deprived of by his will without her consent. In support of which, the cases of *Griffith vs. Griffith*, 4 *H. & McH.*, 101, and *Coomes vs. Clements*, 4 *H. & J.*, 480, have been referred to. But,

although these cases treat of the common law rights of a widow, and decide what those rights were, under the facts disclosed in them, they do not decide how far the common law, in regard to the case before us, has been abrogated or altered by our State legislation.

The first case was decided at May term 1798. The will gave to the wife during widowhood, a portion of the real estate, provided she should claim no thirds in the testator's land, in "Rumney Neck;" making no other devise of realty to her, and containing no bequest of personalty in her favor. She made no renunciation. And the question before the court was, whether she was entitled to one third of the personalty, the same having been all bequeathed to the children of the testator? The court gave judgment in her favor. This decision and the act of 1798, are not at all in conflict. The will gave no part of the personal estate to the widow, nor does it declare any intention that the devise of realty should be in lieu of her legal share of the personalty. The 4th sec. of the 13th sub-chapter of the act, declares, that if only a part of the real estate, or only a part of the personal estate is given, the gift shall bar the widow "of only the real or personal estate, as the case may require;" providing, however, "that if the devise of either real or personal estate, or of both shall be expressly in lieu of her legal share of one or both, she shall accordingly be barred, unless she renounce as aforesaid." Since 1798, there would be no necessity for a renunciation to entitle a widow to her share of the personal estate, in a case similar to that of *Griffith vs. Griffith,* where the will gave her real estate only, and declared that to be in bar of her claim to thirds in a particular part of the testator's realty.

The question involved in the second case, *(Coomes vs. Clements)* did not call for a construction of the act of 1798, as to its effect upon a case like the present. This is apparent from the concluding remarks of the distinguished counsel for the appellee, on page 482. And Justice Johnson says: "The act of 1798, ch. 101, passed before the will in question was made, restricts the widow's interest, whether children or not, to one third in cases to which the restriction applies. The

case before the court does not come within the restricted exception mentioned in the act; and as the testator died without leaving children or their representatives, I am of the opinion the decision of the orphans court giving her one half was correct."

After stating what is claimed to be a widow's rights at common law, it is contended by the appellant, that, although the language of the act of 1798, on the subject of her renunciation, is very general and comprehensive, yet it can only apply to a widow of sound mind, who is capable of exercising a proper discretion, whether she will abide by her husband's will, or claim her legal rights; that those rights were not created by the act, but existed at common law, and are recognized by the provisions of the statute; that in the case of a sane widow she is left fully at liberty to renounce the devises and bequests made to her by the will of her husband, and insist upon her legal claims; that the act does not design to deprive her of her common law rights, unless she sees fit to surrender them, by voluntarily assenting to the will, or neglecting to renounce in proper time. In support of these views, the 5th section of the 13th sub-chapter, has been relied upon, which declares it to be the intent of the act, "and consonant to justice, that a widow accepting or abiding by a devise in lieu of her legal right, shall be considered as a purchaser with a fair consideration." Seeing that a widow who is insane, possesses no discretion, is incapable of making an election or renunciation, or of doing any act which can legally affect her property, it is said to follow, necessarily, that the provisions of the statute, on the subject of renunciation cannot apply to such widow, and her common law rights will remain unimpaired, notwithstanding her husband's will may make devises and bequests in her favor, and there is no renunciation.

The ill effects of an opposite theory have been eloquently portrayed; and particularly the evil of subjecting an unfortunate wife to the danger of being but poorly provided for by a wealthy, but unfeeling husband, and leaving her remediless. It would be very proper that the supposed evil or hardship, should exert an influence in giving construction to a statute,

where its language is ambiguous or doubtful, but when plain and explicit, care should be taken not to allow such considerations to exert an undue influence.    In regard to the effect of hardship, our late learned Chancellor, in *Young vs. Mackall*, 3 *Md.. Ch. Dec.* 406, said, "Considerations of hardship have been pressed upon the court, and to such considerations, when at liberty to listen to them, I by no means profess to be insensible. But I sit here not to make, but to administer the law, according to my best judgment, as I find it enacted by the legislature, or settled by the courts."

In a case where the claims of a widow were concerned, Judge Gaston says: "Where the language of a statute is free from ambiguity, there is much hazard of misconstruction by departing from it in search of the supposed policy of the legislature." 2 *Dev. Eq. Rep.*, 344, *Craven vs. Craven.*

The 1st section of the 13th sub-chapter of the act before us, declares that "every devise of land, or any interest therein, or bequest of personal estate, to the wife of the testator, shall be construed to be intended in bar of her dower in lands, or share of the personal estate, respectively, unless it be otherwise expressed in the will."

The 2nd section provides, that "a widow shall be barred of her right of dower in land, or share in the personal estate, by any such devise or bequest, unless within ninety days," (now extended to six months,) "after the authentication or probat of the will," she shall renounce and quit claim to any bequest or devise made to her in the will, and elect to take in lieu thereof, her dower, or legal share of the estate of her husband.    The only exception to the bar thus created, is to be found in the 5th section; which enacts, that if, in effect, nothing shall pass by such devise, the widow shall not be barred thereby, whether she renounces or not.    *Every valid devise or bequest* is, therefore, made an effectual bar, unless it be removed by a renunciation.    And until that is made the bar remains.    The law admits of no excuse for a failure to renounce.    If she makes no election within the time prescribed, the law makes it, without stopping to enquire why or for what reason she made none.

Thus it appears material changes have been made in the

common law. Various acts on this subject have been passed by our legislature. but the one of most importance, now to be considered is that of 1798. Under this we conceive that when a man dies leaving a will, making *valid* gifts of real and personal estate to his wife, she has not, as she had at common law, a vested right to dower in his land, or to a legal share of his personalty, but her vested rights are under the will by virtue of the statute law. The law clearly gives to the husband the power by his will to bar, or extinguish the common law rights of his widow, unless she thinks proper to quit all claim to the property conferred upon her by the will. And to effect the husband's object the wife need not declare her *assent;* if however, she desires to defeat it, she must manifest her intention to do so, by an express *dissent.* And such dissent is an act, which by the very terms of the law, must precede her becoming entitled to or vested with, those rights which she might have claimed but for the will; for the act declares, she shall be barred of those rights, if she does not renounce and quit claim to the devises and bequests, and make her election to take in lieu thereof her dower, or legal share of the estate. It is this election which vests in her the right of dower or legal share, in lieu of what the will had given. (See 2 *Devereux's Eq. Rep.*, 344.) Whether from design, neglect, or from other cause, the widow fails to make such renunciation, the result is the same. It cannot therefore be said, with propriety, (as has been argued with much ingenuity and earnestness,) that the loss of dower or legal share of the estate, in consequence of a failure to renounce, is a forfeiture; and that consequently an insane widow cannot forfeit her common law rights by failing to renounce, because the law will not impose a forfeiture upon an insane person, for not doing an act which she is incapable of doing. If we are correct in our view of what are now the widow's vested rights, upon the decease of her husband, a failure to renounce does not work a forfeiting of any vested rights; but more properly speaking, that failure simply prevents her from acquiring the same rights she would have been entitled to had her husband died intestate, or made no provision for her in the will, or had expressly declared that such provis-

ions should not bar her claim to dower or legal share of the estate. To acquire such rights in opposition to the will, the law makes the renunciation a necessary act. The non-performance of this act, is therefore, not a · forfeiture of existing rights, but prevents the acquisition of those rights, which, by its performance, might be secured.

That the legislature possessed the authority to make such alterations in the common law, none can doubt; and we feel very confident that, in regard to sane widows, these changes have been made. Let us ascertain whether the present case of an insane widow is embraced within them.

The language of the statute is quite comprehensive enough to include *every widow*, whatever may be her age or mental condition, there being no exception in favor of infants or insane persons. By the 1st section of the 13th sub-chapter, "*every devise of land, or any interest therein, or bequest of personal estate* to the wife, shall be construed to be intended in bar of her dower in lands, or share of the personal estate respectively, unless it be otherwise expressed in the will." And the 2d section declares, that "a widow shall be barred of her *right of dower* in land, *or share in the personal estate by any such devise or bequest*," unless she makes her renunciation.

When the law directs an act to be done, or a condition to be performed for the purpose of conferring a right, that right cannot be acquired if the act is left undone, or the condition is not performed. And if no exception is made in favor of insane persons, courts of justice have no more power to decree to them the allowance of such rights, because of their mental incapacity to comply with the requisites of the law, than they have to decree in favor of sane persons failing to comply. If the law makes no exception the courts can make none, whether they be courts of law or equity; for where the construction of a statute is before them, the rules of construction are the same in both courts. In 2 *Harrison (N. J.) Rep.*, 462., *Thompson, vs. Egbert*, it is said, "There is but one rule of construction for statutes, and that must be applied as well in a court of equity as in a court of law. There is no relief against the provisions of a statute any where."

JUNE TERM, 1854.                    533

Collins, Adm'r of Carman, vs. Carman's Exe'r.

*Humpfrey vs. Gery*, 7 *Man. Gran. & Scott*, 62 *Eng.*, *C. L. Rep.*, 567, is a case in which a lunatic and his committee were plaintiffs, claiming arrears of rent. The case was sent by the Vice Chancellor to the judges of the Common Pleas for their opinion, who certified that the plaintiffs were not entitled to recover the rent due for more than six years. At page 589, justice Maule says, "there being no provision in the latter act extending the disability of lunacy to a case of this sort, and the court having no power to extend it by analogy, the plaintiffs are not entitled to recover the arrears in question."

In *Demarest vs. Wynkoop*, 3 *Johns. Ch. Rep.* 142, Chancellor Kent, with that ability for which he was justly admired, has examined the doctrine in regard to any inherent equity creating an exception as to any disability, where the statute of limitations creates none, and expresses the belief that such a doctrine has been long and uniformly exploded. He says, "General words in the statute must receive a general construction, and if there be no express exception, the court can create none. It was agreed without contradiction in *Stowel vs. Zouch*, (*Plowd.*, 369, *b.*, 371, *b.*,) that the general provision in the statute of fines would have barred infants, *feme coverts*, and the other persons named in the proviso, equally with persons under no disability, if they had not been named in the exception or saving clause." Many authorities are excited and commented upon by the chancellor. Among them he refers to two opinions of Lord Redesdale, as being "remarkably elaborate in tracing the authorities, and in enforcing the duty of a court of equity to render entire *obedience* to all the provisions of the statutes of limitations." This opinion of Chancellor Kent has been approved of in our State, by both the former and present Court of Appeals. 3 *Md.*, *Rep.*, 383, *Hertle & Wife vs. Schwartze & McDonald*. If these are the rules which apply to the statute of limitations, it is difficult to perceive why they should not be equally applicable to other statutes. In *Lewis vs. Lewis*, 7 *Iredell R.*, 73, the court in reference to a matter very analogous to the present, say: "there is no *proviso or saving* in the statute, that in case the widow be a lunatic, then her committee may dissent for her. When the legisla-

ture has not thought proper to insert such a *proviso* in the act, it seems to us to be asking of the court too much, for it to tack such a proviso, by way of construction, to the statute."

With these principles before us, sanctioned by such authority, we cannot but believe the present case is embraced within the broad and explicit language of the act of 1798, and that without a renunciation, the widow had no right to dower, or to her common law share of the personalty.

Can the renunciation of the administrator avail any thing? We think not. To such a proceeding there are various objections. In the first place, by the very terms of the act, the right to renounce seems to be a personal privilege. In one section, speaking of the widow, the language is, "unless *she* shall deliver," &c., and in another, "whether *she* shall or shall not renounce." The nature of the estate she thereby acquires in the realty, being an estate for *her* life, tends to sustain this view of the subject. And in *Boone vs. Boone,* 3 *H. & McH.,* 95, the right to renounce was held to be a privilege personal to the widow, which her representatives could not exercise. But another serious objection is, that the widow for more than four years after the will was admitted to probate, enjoyed all the benefits provided for her by the will. If after this lapse of time, under such circumstances, the administrator can make an effective renunciation, or without any, (as has been contended,) he can claim the common law rights of the widow, there is no reason why he may not do so after a much longer period. And so, whenever a man leaves an insane widow, for the whole period of her life, his estate must, to some extent, remain in an unsettled condition, very much to the annoyance and injury of those who have an interest in it. The law has been vigilant in endeavoring to avoid delay as far as practicable, and to secure a prompt adjustment of claims to property. It is this principle which prompted the legislature of 1798, to require that the renunciation should be made within ninety days; since then the time has been extended to six months. And finding in neither statute, any exception on this point in relation to any case whatever, how can we say there is no limitation of time, in this case, short of the widow's life?

In *Ex-parte Delilah Moore*, 7 *How. ( Miss. ) Rep.*, 668, where an effort was made to renounce a will, some two or three days after the six months prescribed by law had expired, the court say: "It is a dangerous experiment to extend the terms of a statute by construction beyond their obvious import. In attempting thus to moderate the apparent vigor of a rule, we may do more mischief than by a strict adherence to it.    It would tend to destroy the certainty of the law, and thereby increase litigation, and disturb the repose of society." Again they say: "It is better therefore to abide by the law as it is written, than to create exceptions without being able to foresee where they may end."

In a note to *Moot vs. Parkhurst*, 2 *Hill ( N. Y.) Rep.*, 373, 374, Justice Marcy says, "Neither a commisssioner in vacation, nor the court in term, can enlarge the time within which an act is to be done, when such time is regulated by statute."

The great importance of having a widow's rights finally settled within a reasonable and definite period, has been the subject of judicial discussion and decision in many other States of the Union.    In *Craven vs. Craven*, 2 *Devereux, Eq. Rep.*, 346, 347, the court rejected the claim of a widow for dower, because she had not renounced the will in due time.    The able opinion delivered by Judge Gaston, speaks of interests of great magnitude and of general concern, demanding the decision which the court felt it their duty to make.    And inasmuch as the right of dower is paramount to the claims of the husband's creditors, and attaches to the lands after they are alienated by his heirs, the judge thinks, justice and the repose of the community require, that it should be ascertained as speedily as convenience will permit, whether the lands of a deceased man, in the hands of his heirs and devisees are, or are not subject to this incumbrance.    He then says, "The law has defined the time, and prescribed the mode, when and how this fact can be certainly known.    The most obvious considerations of public policy forbid, without the clearest warrant, judicial exposition which will have a tendency to defeat this great purpose of the law."

In *Hinton vs. Hinton*, 6 *Iredell* 277, "the business of the

estate, and the interests of creditors and other legatees," are considered just grounds for requiring an election to be made strictly according to the terms of the law.

In Reid vs. Campbell, Meigs' Rep., (Tenn.,) 388, because the power to dissent changes the whole operation of the will, and opens both real and personal estate to the widow's rights, the court consider it a wise provision, that she is required to make her election within six months after the probate of the will, before any division or distribution of the estate has been made, "so that persons claiming under the will may know what their rights are, and not be harassed by the claims of the widow at any indefinite time after the death of the testator."

In Shaw's Devisees vs. Shaw's Adm'r, 2 Dana's Rep., 343, a renunciation within a reasonable time is held to be necessary for the sake of distributees and legatees, that there may be a speedy adjustment and distribution of a decedent's estate.

If it may be considered a hardship upon those who claim under an insane widow, not to permit her administrator to renounce the will, or without a formal renunciation to repudiate the will and claim the widow's rights, as if nothing had been devised or bequeathed to her, the recognition of such an authority in the administrator would be productive of equally great, if not much greater, hardship and inconvenience to those whose interests are to be affected thereby. And if the argument ab inconvenienti should be allowed to exert any influence in the decision of this case, it ought to operate most favorably to the appellee, the question before us being, whether the administrator, after a lapse of years, can renounce, or if not, whether he can insist that no renunciation in such a case is necessary, but without it may claim in behalf of the widow, what she would have been entitled to in case of intestacy or if the will had given her nothing?

An administrator can have no power to make an effectual renunciation in a case like this. He only represents the personalty. This will gave both real and personal estate to the wife; and consequently a renunciation to be legally effective should extend to both kinds of estate.

When the early case of *Boone vs. Boone* was decided, forty days was the period within which the law required the widow to make her election. She died before the forty days expired, and notwithstanding the shortness of the time, and but little progress had been made in the settlement of the estate, the representatives of the widow were not permitted to renounce the will. The authority of which case, decided in 1791, has never been questioned by any judicial decision or *dictum* in this State, which has come within our knowledge.

The statute of North Carolina requires that the widow "shall dissent in open court," and this statute came under consideration in *Hinton vs. Hinton.* There the widow being unable from sickness to travel, appeared in court by attorney, and through him signified her dissent to the will of her husband. Notwithstanding this manifestation of her unwillingness to abide by the will, and although she was prevented, by physical inability, from complying with the strict terms of the law, nevertheless the court rejected her claim, because she had not signified her dissent in open court, in *propria persona.* It was this same statute which came before the court again in *Lewis vs. Lewis.* The widow in that case was a lunatic under the care of a committee. It appears that, in point of fact, her dissent to the will was signified in open court. Assuming this dissent to be valid, a petition was subsequently filed in behalf of the widow, claiming that some suitable portion of the husband's estate should be allotted to her according to the statute. The Supreme Court, however, held that the dissent was not hers, but that of the guardian, and as the act gave him no power to dissent, the claim was rejected and the petition dismissed. But it has been said these North Carolina cases cannot have any great weight on the side of the appellee, because, in that State, the widow never had such a common law right to a share of the personalty as prevented the husband from bequeathing the whole of his personal property to others, to the exclusion of the wife; and as her rights were created by the statute, her voluntary assent to the will could not be necessary to bar or defeat her

68      v.5

common law privileges, because she had none to be barred
or defeated.   We need not stop to ascertain the correctness
of the position here assumed, as to the law of North Carolina
independently of their statute, for admitting the assumption
to be correct, still the argument of the appellant based upon
it cannot avail him, if the views already expressed by us in
reference to the change made in the common law by our leg-
islature are not erroneous.   Our opinion is, that when a will
makes valid gifts to a wife, then, under our statute, she has
no such common law rights as render her *voluntary assent* to
the will necessary to bar or defeat them; the law itself creates
the bar, unless being dissatisfied with the will she *actually*
*renounces* it, and her *positive dissent* confers upon her just
such portions of the estate as she could have claimed had her
husband died intestate.   We think the language of the statute
not only sanctions, but requires, such a construction.   And
we are confirmed in this opinion by the decision in *Boone vs.*
*Boone.*   The act then in force, so far as assent or dissent by
the widow is concerned, is very much the same as that of
1798.   The former act allowed the widow forty days to
deliberate, and yet her death, before the expiration of that
time, prevented her representatives from renouncing.   There
no evidence of voluntary assent was furnished, but the absence
of dissent concluded her, and those claiming under her.
Because she might have renounced before her decease, it is
by no means a fair inference that she was satisfied with the
will, for the law allowed her forty days for reflection, and to
ascertain the condition of the estate, and her renunciation on
the thirty-ninth day would have been as effective as on the
first.   Her privilege was just the same each and every day
until the fortieth.   If death on the thirtieth, without a renun-
ciation, put an end to the right of election, we do not see
why the death of the widow the next hour after her husband's
decease should not have produced the same effect.   It is not
true that the bar is based upon *consent,* and the failure to
renounce is to be considered as the evidence of that consent.
. If lapse of time can create a legal inference of consent, surely

to justify the inference it must require the whole time pre-scribed by law within which the renunciation may be made. Should the widow die within that period, would not the inference fail for want of sufficient time? It would be a strange proposition to assert that the failure to renounce by a deceased person could afford a presumption of consent. And yet in *Boone vs. Boone* the widow died in less than forty days, and her common law rights were barred.

We cannot subscribe to the doctrine, so much insisted upon by the appellant's counsel, that the widow's rights are barred only in virtue of her assent to the will, and as an insane widow can give no assent, the statute does not apply to such a case. We think the common law rights of a sane widow are barred by the devises and bequests in her favor contained in the husband's will, unless they are actually renounced, even although she may desire to renounce them. The bar does not rest upon her assent, but is created by the will, and those rights of a widow which existed at common law, if she desires them, can only be vested in her by a renunciation. And inasmuch as the language of the statute is comprehensive and explicit enough to embrace the case of every widow to whom *valid* and effectual gifts are made by the will of her husband, and there is no proviso or saving in favor of an insane widow, such a case as the present is within the bar created by the statute.

The 5th section of the 13th sub-chapter has been repeatedly referred to as having much influence in favor of the appellant's claim. This considers the case of a widow *accepting or abid-ing* by a devise in lieu of her legal right, as analogous to that of a purchaser with a fair consideration. When the object of the section is looked to, it is evidently not intended to have any effect upon the matter of volition or consent, but the analogy to the case of a purchaser is manifestly in reference to the validity of the devise. The section commences thus: "But if, in effect, *nothing shall pass* by such devise, she shall not be thereby barred, whether she shall or shall not renounce as aforesaid." What is it which renders the renunciation

unnecessary? Clearly the failure of the devise. And it is declared to be so, because it is consonant to justice that a widow accepting or abiding by a devise, in lieu of her legal rights, shall be considered as a purchaser with a fair consideration. As the failure of the devise is the case intended to be provided for, *a fair consideration* in a purchase is the point to which the analogy has particular reference. And inasmuch as the prior sections of the chapter provide that every devise, &c., shall bar the widow's rights, unless the bar is removed by a renunciation, the law necessarily makes the failure to renounce, whether voluntary or not, *an acceptance or abiding* by the devise. In legal contemplation every widow who does not renounce the valid gifts made to her by the will does *accept or abide* by them.

It would seem to be a forced construction of this section, to suppose it was designed to provide for the free exercise of volition on the part of the widow, when it declares she shall not be barred, whether she shall or shall not renounce, if in effect she gets nothing by the will. With more propriety it may be considered as intended to protect her from being injured by her own voluntary act. For although she may, deliberately and freely, determine to abide by the will, yet, notwithstanding her positive assent thereto, if the provisions designed for her benefit prove to be of no value, she may still claim those rights which a widow would be entitled to at common law.

*Decree affirmed with costs.*